WHOOLERY *v.* HAGAN, ET AL.

[No. 575, September Term, 1966.]

*Decided November 7, 1967.*

The cause was argued before HAMMOND, C. J., and HOR-
NEY, MARBURY, BARNES and McWILLIAMS, JJ.

Submitted on the brief by *Sidney Blum* and *Kenneth R.
Hammer* for appellant.

*Jeffrey B. Smith,* with whom were *Barbara Ann Spicer* and
*Smith, Somerville & Case* on the brief, for appellees.

McWILLIAMS, J., delivered the opinion of the Court.

The appellant (Whoolery) wants a new trial. He says the
trial judge's charge to the jury contains error sufficient to jus-
tify upsetting the judgment against him for costs. We do not
see it that way.

The City of Baltimore has for some years engaged The Wels-
bach Corporation (Welsbach) to maintain the street lamps in
the parks and on the bridges. At about 8:30 p.m. on 24 Au-
gust 1961 the drawbridge operator (Hollins) on the Hanover
Street Bridge, one of the Patapsco River crossings, notified
Welsbach that the second light north from the draw on the east
side of the bridge was out. The appellee Hagan was informed
of this by radio. A little before 9:00 p.m. he stopped his truck
in the easternmost lane near the lamp post requiring his atten-
tion. The weather was clear and dry.

The bridge accommodates 5 lanes of traffic. Overhead signals
regulate the use of the lanes consistent with the demands of
traffic. Hollins said three lanes were devoted to northbound
traffic when Hagan arrived on the scene. According to Whool-
ery only two lanes were available to northbound traffic. Hagan's
truck was painted "bright yellow." In the rear on each side of
the truck there was a strip of reflective, luminous material, 6 to
8 inches wide and about 24 inches long, arranged the "same
as a barber pole" with alternate red and white stripes. In addi-
tion to the two red tail lights there were two "big, bright, blink-
ing lights" (showing red to the rear, amber to the front)
mounted on steel brackets about 4 feet above the ground, one
on the right side of the truck and one on the left. In front were

another pair of the same blinking lights. Hagan said there was one on each front fender but McCrory, a fellow employee, who described Hagan's truck in considerable detail, said that on all of Welsbach's trucks, including Hagan's, these lights were placed on top of the cab. McCrory was quite positive that all four of the blinking lights (as well as the two tail lights) could be seen from the rear of the truck.

Hollins saw Hagan arrive, stop at "the light that was out of order," "put on his blinkers," get out of the truck and go to the pole "to find the trouble." He watched him working at the pole for "approximately ten minutes or a little more." He observed the traffic "detour" around the truck. "They'd wait," he said, "until they got an opening and go out in the middle lane." He "wouldn't say [the traffic was] heavy. * * * It was about medium." Stopping or standing at any time is prohibited. Signs posted on both sides of the bridge so warn motorists.

Whoolery, a 39 year old Baltimorean, is an ironworker. In August 1961 he had been working for some months on a construction project in Seaford, Delaware, 100 miles from his home. On Wednesday, 24 August, as was his custom, he drove his 1956 Buick to Seaford, arriving there shortly before 8:00 a.m. With him were four fellow workers whom he had picked up at Curtis Bay, on the south side of Baltimore. He had bought the car in June and it appears to have been in "perfect condition." At 4:30, quitting time, they "always washed up and changed clothes at the wash house." He and his four riders left Seaford between 5:15 and 5:25 p.m. They stopped in Denton, Maryland, about 45 miles from Seaford. They "always stopped there and * * * some would have sandwiches, some beer, and then * * * [they] would go on home." They stayed in the "little bar and restaurant * * * close to an hour." Whoolery had 2 bottles of beer, he said. About half way across the Chesapeake Bay Bridge one of his tires went flat. He "drove all the way across to the toll gate [about 2 or 3 miles] and that's where * * * [he] changed the tire." He thought that took "about 45 minutes." He discharged his passengers in the Curtis Bay area and headed for home. He was in the lane nearest the curb as he started across the Hanover Street Bridge. He said it was dark, that the traffic was "right heavy," and that his speed was "around thirty-

five," and that he was "maybe one or two cars behind the other car in front of * * * [him]." Although he was at that moment unaware of it, he was approaching Hagan's truck which had been stopped in the same lane for ten minutes or more.

Whoolery testified that as he came "across the bridge * * * [he] took notice of [Hagan's] truck, but * * * [he] didn't notice it was stopped or nothing" and that it was not until he got "within 40 or 50 feet of the truck" that he "realized it was stopped. That's when * * * [he] put on * * * [his] brakes to stop." He thought he was "around 100 feet" from the truck "the first time * * * [he became aware] it was there." His brakes "took hold." He "could feel them grab the road." The investigating officer testified Whoolery's skid marks were "erratic" by which he meant "one was longer than the other one." He couldn't remember how long they were.

Asked if there was any traffic in the lane to his left when he realized Hagan's truck was not moving, Whoolery replied, "Yes, sir. I glanced—I was going to pull out of the path and I seen I wasn't going to be able to stop. I was going to pull out and there was a car coming up right on my left rear fender and I couldn't pull out." Asked why he didn't see the truck sooner he said "there was other cars in front of * * * [him]." When they turned into the lane to the left was "just about the time * * * [he] spotted that truck setting there." His radio was receiving the WCAO program just before the collision.

Lucas Alaba, a janitor at Friendship International Airport, was produced as a witness for the plaintiff. He drove past the scene of the collision soon after it happened. He didn't "recall any lights on the truck." His testimony has little significance, however, because Hagan testified that when he got back to the truck after the collision the "blinker lights [and the tail lights] were out." They went out, he said, when Whoolery hit the truck and knocked off the left tail light which in turn cut the wires and opened that circuit.

The case was tried before Judge Grady and a jury on 17 October 1966. The judge reserved his ruling on the defendants' motion for a directed verdict offered at the close of the plaintiff's case and he again reserved his ruling when the same motion was offered at the conclusion of the whole case. In his

charge to the jury he remarked that the "evidence is not clear as to whether the truck was stopped or parked in accordance with or in violation of the parking regulations in effect at that place and time." He noted, however, that the "law is clear that * * * [the truck] was not an authorized emergency vehicle, as provided by law." He instructed the jury that *"under the circumstances then and there existing,* it makes no difference whether the standing, stopped or parked truck was in violation of or in accordance with the parking regulations, since the mere presence of the truck on the bridge, *under the circumstances then existing,* cannot be considered an act of negligence." (Emphasis supplied.) Continuing, he pointed out that the existence of negligence "comes down to the question of whether or not the truck was visible to the plaintiff at a sufficient distance so that the plaintiff either was or should have been aware of its presence." After discussing at length the several alternatives which might have been considered by the jury he said, "In deciding this issue, if you find that the lights, *as described,* were properly burning and flashing, *as was described in the evidence,* then, of course, you would find that the defendants were not guilty of negligence and your verdict must be in their favor." (Emphasis supplied.) In arriving at their verdict in favor of the defendants (appellees) the jury may have found that Hagan's lights were "properly burning and flashing" or they may have found that Whoolery was contributorily negligent. If, in fact, they acquitted Whoolery of any contributory negligence then Judge Grady's charge, in respect of the lights, if erroneous, may indeed have been prejudicial.

## I.

Whoolery first challenges the propriety of the instruction that the mere presence of the truck on the bridge cannot be considered an act of negligence. He cites Code, Art. 66½, § 245 (12) which prohibits stopping, standing or parking "upon any bridge." He points out that since Hagan's truck was neither disabled nor could be accorded the status of an authorized emergency vehicle, the violation of the statute was evidence of negligence.

In *Maggitti v. Cloverland Farms Dairy,* 201 Md. 528, 95 A. 2d 81 (1953) a like contention was made in respect of subsec-

tion (11) of § 245 which prohibits "double-parking" except for the purpose of receiving or discharging passengers or merchandise. Judge Henderson, for the Court, said:

"If the declaration in the instant case relies upon an unlawful parking, in violation of the statute and not within the exception, it may be questioned whether the prohibition was designed to protect other users of the highway or affect their relative rights in any way. The legislative purpose was obviously to expedite traffic, as far as possible, for it is notorious that such parking impedes the flow of traffic even more than parking at the curb. In *Christman v. Weil,* 196 Md. 207, 212, 76 A. 2d 144, 146, we pointed out that the statute providing that a commercial vehicle shall not follow within 150 feet of another commercial vehicle, was designed to permit lighter vehicles to pass and was not material on the question whether the defendant's truck was at fault in following more closely than was reasonable or prudent under the circumstances." *Id.* at 532.

The prohibited act in *Ennis v. Atkin,* 354 Pa. 165, 47 A. 2d 217 (1946) was the parking of a milk truck within 15 feet of a fire hydrant. In turning a corner on the way to a fire a "hook and ladder" truck came in contact with the illegally parked milk truck, killing the tillerman. Affirming the judgment for the defendant, the court said:

"Appellant contends that parking within 15 feet of the fire hydrant was negligence per se and that the court erred in charging that the stopping with relation thereto was not the proximate cause of the accident. Whether a violation of statute constituted negligence per se has been thoroughly considered in * * * [citing cases]. Rules regarding civil liability are ably set forth in section 286, Restatement, Torts [1934 Ed.]: 'The violation of a legislative enactment by doing a prohibited act, or by failing to do a required act, makes the actor liable for an invasion of an interest of another if: (a) the intent of the enactment is exclusively

or in part to protect an interest of the other as an individual; and (b) the interest invaded is one which the enactment is intended to protect; and, (c) where the enactment is intended to protect an interest from a particular hazard, the invasion of the interests results from that hazard; and, (d) the violation is a legal cause of the invasion, and the other has not so conducted himself as to disable himself from maintaining an action.'

"Clearly the facts are insufficient to charge appellee with negligence per se. No profound analysis of the statute is required to show that the restriction upon parking within fifteen feet of a fire hydrant was intended to assure immediate availability in case of a fire in the vicinity and not to aid in regulating traffic as an aid to highway safety.

"The trial judge properly stated that the stopping of the truck with relation to the fire hydrant was not the proximate cause of the accident. Assuming that appellee's truck was stopped within fifteen feet of the fire hydrant, that fact might have been a circumstance; it cannot be said to have been a cause. The fact of contact between the fire apparatus and appellee's truck and the fact of an accident, under such circumstances, do not establish the causal connection necessary to determine civil liability." 47 A. 2d at 219.

To the same effect see W. Prosser, *The Law of Torts* (3rd ed. 1964), pp. 193-98; Restatement (Second) of Torts, sections 286, 288 (1965); *Liberto v. Holfeldt,* 221 Md. 62, 155 A. 2d 698 (1959) and cases cited therein.

We consider here, for the first time, what purpose the Legislature may have had in mind when it enacted Code, Art. 66½, § 245 (12). Since bridges often tend to become bottlenecks it seems to us virtually axiomatic that the Legislature intended only the facilitation and expedition of traffic and not the protection of users of the bridge. To paraphrase what Judge Henderson, in *Maggitti, supra,* said of double-parking on streets, it is notorious that stopping or standing on a bridge impedes and at times chokes the flow of traffic.

It should be observed also that the violation of the statute, or, as Judge Grady expressed it, the "mere presence of the truck on the bridge," was not, in these circumstances, the proximate cause of Whoolery's injury. The night was clear, the paving was dry, the bridge was level and lighted, the truck was not parked on a curve and, as Hollins testified, the traffic which he described as being not "heavy" but "medium" safely passed the truck for a period of "ten minutes or a little more." If its presence there had been lawful its visibility (assuming that all of its lights were burning) would not have been increased nor would a lawful status have enabled Whoolery to become aware of its presence any sooner.

## II.

Whoolery next contends that when Judge Grady instructed the jury to render a verdict for the defendants if they found that "the lights, *as described,* were properly burning and flashing, *as was described in the evidence"* he committed reversible error. (Emphasis supplied.) The judge, it will be recalled, also told the jury that the existence of negligence, on the part of Hagan, "comes down to the question of whether or not the truck was visible to * * * [Whoolery] at a sufficient distance so that * * * [he] either was or should have been aware of its presence." In the circumstances of this case we think that was a fair statement and it should be noted that Judge Grady was careful to delimit his charge to those circumstances. Whoolery insists the jury should have been allowed to consider whether Hagan's failure to put out flares, lights or other signals amounted to negligence on his part. For him to have done so might, perhaps, have minimized the possibility of collision but we are unwilling to say that his failure to do more than he did is evidence of negligence. He had no reason to suppose that his truck, in the circumstances, could not, or would not, be seen by approaching drivers in time to stop or go around. Had speeds well in excess of 35 miles per hour (say 55 or 60) been permitted on the bridge, Whoolery's argument might have some force. However, it is unnecessary for us to go into that now.

## III.

We set forth in full the requested instruction out of which arises Whoolery's final contention.

"Negligence is lack of ordinary care under all of the circumstances. It is the failure to act with the care which a reasonably prudent man would have exercised under the same or similar conditions.

"An act is negligent if the party should realize, under the attendant circumstances, that it is likely to affect the conduct of another in such a manner as to create an unreasonable risk to the other, and if what occurred reasonably was to have been anticipated, or induced by, the party's acts or failures to act under the circumstances. Whether lack of care is legally a contributing cause of a collision depends upon whether it ought to have been foreseen according to the usual experience of travelers. A person is bound to anticipate and provide against what usually happens and is likely to happen, but is not bound to guard against what is unusual and unlikely to happen, or what is only remotely and slightly probable."

Judge Grady took the position that the instruction set forth above (together with an instruction submitted by the appellees) is "merely the elaboration of the general duty to use reasonable and prudent and ordinary care." While the requested instruction is a correct statement of law we think it is substantially covered in the charge and, in these circumstances, its refusal is not reversible error. *Singleton v. Roman,* 195 Md. 241, 72 A. 2d 705 (1950). In any event, it will be recalled, we have already dealt with the matter of foreseeability.

*Judgment affirmed.*
*Costs to be paid by the appellant.*