PYLE *v.* LEE

[No. 253, September Term, 1967.]

*Decided June 7, 1968.*

The cause was argued before HAMMOND, C. J., and MAR-BURY, BARNES, McWILLIAMS and FINAN, JJ.

*Paul Berman,* with whom were *Bayard Z. Hochberg, A. Free-born Brown* and *T. Carroll Brown* on the brief, for appellant.

*William M. Nickerson* for appellee.

McWILLIAMS, J., delivered the opinion of the Court.

The source of the issue here presented is Code, Art. 66½, § 217 (b) (1967 Repl. Vol.). Since the statute is controlling, contends the appellant (Miss Pyle), the trial judge should have declared the appellee (Lee) negligent as a matter of law or, alternatively, he should have submitted to the jury her "Request for Instruction No. 21" which reads as follows:

> "The Court instructs the jury that at the time of the collision of automobiles the motor vehicle laws of Maryland provided as follows: *any vehicle moving at a rate of speed ten miles or more below the maximum speed limit applicable to the particular roadway shall be driven upon the extreme right side thereof, and where shoulders and extensions are provided, then upon the extreme right side of the shoulder or extension."*
> (The language of the statute is italicized.)

The collision out of which the issue arises occurred at 12:45 A.M. on 11 December 1965 in the westbound lane of U. S. Route 40 between Havre de Grace and Aberdeen. Lee, alone in his 1954 Chevrolet, black with a white top, and almost out of gasoline, was in search of an open filling station. Peaco, a

friend who also was alone in his car, had been following Lee so as to provide assistance in case his gasoline ran out before it could be replenished. Lee drove into Skyway Auto Parts (Skyway); Peaco waited near the entrance. There were gas pumps and the place appeared to be open for business but, he was told, the tanks were empty. They decided Lee would go on toward Aberdeen with Peaco following. Before reentering Route 40 from the Skyway exit Lee looked back (to the east) and saw the glow of headlights (on a car driven by Ronald Leroy Skillman) just behind the crest of a slight rise which he said was about a quarter of a mile away (the crest was about 800 to 900 feet distant according to a plat admitted in evidence). Thinking he "had ample time to get out on Route 40" he drove out into the slow lane and continued in a westerly direction. He said he "was out there doing about 30 or 35 miles per hour and * * * [he] must have traveled 170 or 180 feet" when he was struck in the rear.

Peaco had parked on the shoulder of the highway between the entrance and the exit. After Lee had entered Route 40 he started his engine, he said, but the lights seemed "to be coming too fast for * * * [him] to pull out, so * * * [he] waited." He saw the car "swing to the left" after it passed by him but it was too late "at that rate of speed" to avoid hitting Lee. He said Lee's rear lights were burning and that he had gone about 175 feet before he was struck. Peaco also said that when the lights were about 400 feet east of where he was parked Lee had traveled about 50 feet westerly on Route 40.

Skillman had left his home in Joppa close to 8:30 P.M. He drove his new 1965 Chevrolet Impala Super Sport to a nearby tavern. He drank 2 bottles of beer and at 9:15 he drove to the Steak House, a tavern in Aberdeen, where he had 2 more bottles of beer. At 10 o'clock he drove to a tavern in Havre de Grace, a distance of about 5 miles, where he met Miss Pyle. They drank more beer. He said she was "just stuttering a little bit, like when you drink." They left around midnight to return to the Steak House in Aberdeen. Skillman entered Route 40 at an intersection about 0.70 of a mile east of Skyway and immediately accelerated to a speed of 75 to 80 miles per hour in the outside or "slow" lane. Apparently there were no other

vehicles on the highway at the time except Lee whose car, Skill-man said, was only "about two car lengths away from * * * [him] when * * * [he] seen it." There "wasn't nothing * * * [he] could do but to try to swing out, and * * * [he] hit it." Asked if there were any lights on Lee's car he said he "didn't *see* any tail lights at all." (Emphasis supplied.) He agreed that he was "paying strict attention to * * * [his] driving." Miss Pyle explained that she did not see Lee's car at all because she had her head down "looking at the tachometer."

There is a conflict in the testimony in respect of the point of impact. The State trooper said the distance from the Sky-way exit to the debris on the road was 50 feet. Lee and Peaco said they measured the same distance with a tape measure the following morning and found it to be 175 feet. Lee's wrecked car came to rest athwart the shoulder alongside a highway sign which is 220 feet from the same beginning point. If the trooper's measurement is correct then Lee's car traveled 160 feet after being struck; if Lee and Peaco are correct, Lee's car traveled only about 50 feet and it looks to us as though the probabilities favor the latter measurement. Curiously enough there was nothing said about tire marks on the highway. Nor did Skill-man say he applied his brakes before the collision. His car came to rest upside down on the median strip.

Route 40 at this point is straight with an excellent macadam surface. The eastbound lanes are separated from the westbound lanes by a grassy median strip 38 feet wide. Each 24 foot lane is subdivided into two 12 foot lanes, separated by a broken white line. The shoulder, 7 feet wide, slopes down to a con-crete gutter. The surface of the shoulder is noticeably inferior to that of the highway. The plat and the photographs in evi-dence make it quite clear that the driver of a passenger car approaching Skyway from the east would have an unobstructed view straight ahead for more than 1,000 feet before reaching the Skyway entrance and for several thousand feet beyond the entrance. That the road was dry is undisputed. The sky was overcast and the principal source of available light was the head-lights of the vehicles involved.

Miss Pyle's suit against Skillman and Lee was tried in the Circuit Court for Harford County on 31 March 1967 before

Day, C. J.,[1] and a jury. The court's instruction to the jury was lengthy, comprehensive and unremarkable. As we have said he refused to rule that Lee was negligent as a matter of law and he denied Miss Pyle's "Instruction No. 21." He left it to the jury to say whether Lee or Skillman, or both, were negligent and whether Miss Pyle was contributorily negligent. The jury's verdict reflects the exoneration of Miss Pyle and Lee of any negligence. Skillman has not appealed from the verdict against him.

Neither in her brief nor in the argument before us did Miss Pyle press her contention that the trial judge erred when he declined to instruct the jury that Lee was negligent as a matter of law. In any event, we think the trial judge was entirely justified in leaving that issue to the jury. His refusal to grant "Instruction No. 21," however, is attacked with vigor.

Code, Art. 66½, § 217, in its entirety, is as follows:

> "§ 217. Drive on right side of roadway; exceptions.
>
> "(a) *General rule and exceptions.*—Upon all roadways of sufficient width a vehicle shall be driven upon the right half of the roadway, except as follows:
>
> "(1) When overtaking and passing another vehicle proceeding in the same direction under the rules governing such movement;
>
> "(2) When the right half of a roadway is closed to traffic while under construction or repair;
>
> "(3) Upon a roadway divided into three marked lanes for traffic under the rules applicable thereon; or
>
> "(4) Upon a roadway designated and signposted for one-way traffic.
>
> "(b) *Special rule for slow moving traffic.*—Any vehicle moving at a rate of speed ten miles or more below the maximum speed limit applicable to the particular roadway shall be driven upon the extreme right side thereof, and where shoulders or extensions are provided, then upon the extreme right side of the shoulder or extension."

---

1. Chief Judge Day retired on October 26, 1967.

The trial judge, in stating his reasons for overruling the motion for a new trial, was of the opinion that § 217 (b) did "not apply to the situation at hand, where [Lee's] car ha[d] turned on to a highway and not had enough time to accelerate to a speed no less than 10 miles per hour below the limit." He might have advanced as additional reasons the fact that the shoulder was only 7 feet wide, that its surface was far from ideal, that it sloped away from the "slow lane" and ended in a concrete drainage gutter, and, of perhaps greater significance, that, at the moment of collision, there was no other traffic in the area and that the "fast lane" was unobstructed for a considerable distance ahead. While we think there is much to recommend the notion that § 217 (b) has no application in these circumstances it does not require our consideration because, in our judgment, there is little doubt that the sole proximate cause of the collision was Skillman's failure to maintain a proper lookout ahead, compounded, of course, by a speed 20 to 25 miles per hour above the posted (55 m.p.h.) limit.

Since Skillman lived nearby we must assume he had some degree of familiarity with this particular stretch of Route 40. We shall assume also that he knew, as he must have known, that it was not a denied access highway. A careful scrutiny of the photographs makes it wholly clear that as Skillman approached the crest of the "slight rise" the "T shaped lights that were hanging over * * * [Skyway's] gas pumps," which the trooper said were lighted, would have been visible to him at a distance not less than 1,000 feet ahead and quite likely for an even greater distance. The "CITGO" [2] sign would have been within his line of sight at the same distance but it is not clear from the testimony that it was separately lighted at the time. In any event, if he saw the "T shaped lights," and we must assume that he did, *Dashiell v. Moore,* 177 Md. 657, 11 A. 2d 640 (1940), he could not fail to know that he was approaching either a filling station or some other roadside business from which motor vehicles might, from time to time, be expected to

---

2. A nationally advertised brand of gasoline identified by a distinctive sign. The top of the sign was somewhat higher than the "T shaped lights."

debouch. Even if we could assume that in these circumstances Skillman was not under any necessity to reduce his excessive speed, he was surely bound to keep the Skyway exit under sharp and constant observation and be prepared to move over into the fast lane should some vehicle emerge therefrom. Had he done so, if Peaco is to be believed, he would have seen Lee's car enter Route 40 when he was about 700 or 800 feet away. Again relying on Peaco's testimony, had Skillman been keeping a sharp lookout ahead when he was 400 feet from the Skyway exit, he would have seen Lee's car directly ahead, 50 feet beyond the exit. Yet he insists that Lee was only "two car lengths * * * in front of * * * [him]" when he first saw him. Of course, Skillman testified he "didn't see any tail lights at all." However unlikely that may be, it is undisputed that Lee's car had a white top and that his headlights were burning.

Lee's testimony that he had attained a speed of 30 to 35 miles per hour has not categorically been controverted and it has been corroborated by Peaco. If we assume its truth it would seem to follow that Skillman's speed, relative to Lee, would be reduced to 45 or 50 miles per hour. Certainly it is within the knowledge and experience of the average driver that any passenger vehicle can, at those relative speeds, safely and quickly be moved from one lane to another, especially when no other traffic is present, and, that maneuver could doubtless have been executed by Skillman just as safely and perhaps a little more quickly in his new 1965 Impala Super Sport.

As we have indicated, one cannot escape the conclusion that the reason Skillman did not see Lee sooner is that he was not looking and that when he did see him his excessive speed had already foreclosed whatever chance he might have had to escape the collision. Lee's contribution to the accident, as was said in *Sun Cab v. Faulkner,* 163 Md. 477, 479, 163 A. 194 (1932), "appears to have been only that of being there at the moment." That he may have been, at the moment of collision, in violation of § 217 (b) can be evidence of negligence only if the violation was the proximate cause of the accident. *Whoolery v. Hagan,* 247 Md. 699, 234 A. 2d 605 (1967) ; *Sun Cab v. Cusick,* 209 Md. 354, 121 A. 2d 188 (1956).

Since we see no error in Judge Day's rulings, we shall affirm the judgment below.

*Judgment affirmed. Costs to be paid by the appellant.*